**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricky Lee SANDS, Defendant–Appellant.**

**Muscogee (Creek) Nation and Seminole Nation of Oklahoma; Cherokee, Choctaw and Chickasaw Nations, Amici Curiae.**

**No. 91–7027.**

United States Court of Appeals, Tenth Circuit.

July 7, 1992.

ployees by the personnel policies did have this

recognized limitation.

Edwin Kneedler, Atty. (Sidney M. Glazer, Acting Chief, Appellate Section, Criminal Div. and Andrew Levchuk, Atty.), Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Susan L. Foreman, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender), Denver, Colo., for defendant-appellant.

Leah Harjo Ware, Atty. Gen., Muscogee (Creek) Nation, Okmulgee, Okl. and L. Susan Work, Atty. Gen., Seminole Nation, Ada, Okl., for amici curiae Muscogee (Creek) Nation and Seminole Nation of Oklahoma.

James G. Wilcoxon and Chad Smith, Muskogee, Okl., and Bob Rabon, Rabon, Wolf & Rabon, Hugo, Okl., for amici curiae Choctaw and Chickasaw Nations.

Before LOGAN, ENGEL [†] and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Defendant-appellant Ricky Lee Sands appeals his murder conviction and sentence. His prosecution for this offense has a long history. Mr. Sands and the victim, John Mauldin, are Creek (Muscogee) Indians and the incident occurred on a restricted fee allotment in the territory of the Five Civilized Tribes (which includes the Creeks) in eastern Oklahoma. He was prosecuted in Oklahoma state court for first degree murder, but successfully moved to have the case dismissed for lack of jurisdiction. Mr. Sands argued that the United States had jurisdiction, not Oklahoma. He then was prosecuted by the United States and pled guilty to possession of a firearm by a previously convicted felon, 18 U.S.C. §§ 922(g)(1) & 924(a)(1)(B), and was convict-

---

[†] The Honorable Albert J. Engel, Senior United States Circuit Judge for the United States Court of Appeals, Sixth Circuit, sitting by designation.

ed by a jury of first degree murder, 18 U.S.C. §§ 1111 & 1153. On appeal, a divided panel reversed the murder conviction due to improper references to Mr. Sands' stay in the penitentiary. *United States v. Sands*, 899 F.2d 912 (10th Cir.1990). On retrial, Mr. Sands again was convicted by a jury and was sentenced to life imprisonment, with five years of supervised release on the murder count, and to a concurrent five years, with three years of supervised release, on the firearm count.

On appeal, Mr. Sands contends that (1) the prosecutor made an improper reference to his post-arrest silence, (2) the prosecutor engaged in misconduct by attributing an inculpatory statement to him which was not in the record, (3) the district court's jury instructions failed to apprise the jury that voluntary intoxication had a bearing on whether the murder was premeditated, (4) the district court erred in not granting him a hearing on his new trial motion based on ineffective assistance of counsel, and (5) the district court misapplied the Sentencing Guidelines because it was unaware of its discretion to depart downward. The government, after prosecuting Mr. Sands, now contends that we are without jurisdiction to hear this appeal because the district court lacked subject matter jurisdiction over the offense. The government urges us to adopt its frequently raised, but never accepted, argument that the State of Oklahoma retained jurisdiction over criminal offenses in Indian country. We first consider the jurisdictional issue, find the government's position wanting, and then affirm on the merits.

## I.

In a nutshell, the government claims that the Indian Major Crimes Act, 18 U.S.C. § 1153,[1] which provides that federal criminal law applies to various offenses committed by Indians against Indians "within the Indian Country," does not apply because the restricted allotment in this case is not "Indian country" as defined in 18 U.S.C. § 1151.[2]

According to the government, Congress intended to treat members of the Five Civilized Tribes essentially the same as non-Indians subject to state law. The government reaches this conclusion based on certain statutes predating the enactment § 1151. Specifically, the government urges that the following acts control the application of § 1151: (1) Indian Department Appropriations Act of 1897, ch. 3, § 1, 30 Stat. 83; (2) Curtis Act (Act of June 28, 1898), ch. 517, §§ 26, 28, 30 Stat. 495, 504–505; (3) Act of April 28, 1904, ch. 1828, § 2, 33 Stat. 575; and (4) Oklahoma Enabling Act of June 16, 1906, ch. 3335, §§ 2, 13, 16, 20–21, 34 Stat. 267–268, 275–78. *See also* Enabling Act Amendment, ch. 2911, §§ 1, 3, 4, 34 Stat. 1286–88. The government contends that criminal jurisdiction was conferred on Oklahoma in 1906 when cases of a local nature arising in Indian Territory were transferred to the State and the laws of Oklahoma were extended to Indian Territory.

The government relies on perceived Congressional intent and practical considerations to support its position. Several Congressional acts applicable to the allotments of the Five Civilized Tribes provide that state law governs concerning alienation,

---

1. 18 U.S.C. § 1153 provides in pertinent part:
   **Offenses committed within Indian country**
   (a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, ... shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

2. 18 U.S.C. § 1151 provides:
   **Indian country defined**
   Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian

country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

**1062**

partition and heirship. These acts ostensibly demonstrate that Congress intended to confer broad jurisdiction on the State of Oklahoma, even going beyond a grant of criminal jurisdiction to the State. Additionally, the government points to practical considerations which suggest that the State should assume criminal jurisdiction over "checkerboard" Indian allotments because the State plainly has jurisdiction over neighboring non-Indian land.

■ We agree with the amici curiae that the allotments of individual citizens are Indian country within the express terms of § 1151(c). By 1948, when § 1151 was enacted, "Indian country" included both trust allotments and restricted fee allotments, as in this case. *See United States v. Ramsey*, 271 U.S. 467, 471, 46 S.Ct. 559, 560, 70 L.Ed. 1039 (1926); *United States v. Pelican*, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914). *See also State v. Burnett*, 671 P.2d 1165, 1167 (Okla.Crim.App.1983). Section 1151 contains no hint that allotments of the Five Civilized Tribes are not within its reach. We have ruled to the contrary. *Indian Country, U.S.A. v. Oklahoma Tax Comm'n*, 829 F.2d 967 (10th Cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988).

In *Indian Country, U.S.A.*, we held that Oklahoma laws concerning the regulation of bingo and collection of sales tax were preempted on unallotted Creek tribal lands. In reaching this conclusion, we construed § 1151(a) and also recognized that "[t]ribal lands, trust lands, and certain allotted lands generally remain Indian country." *Id.* at 973, 975 n. 3. The government's position in this case is virtually identical to that of the State of Oklahoma in *Indian Country, U.S.A.*, although the government relies on the Act of April 28, 1904 as additional support for the theory. We agree with amici Muscogee (Creek) Nation and Seminole Nation that the enactments relied on by the government did not abrogate the federal government's authority and responsibility, nor allow jurisdiction by the State of Oklahoma. Amici Brief at 9–16; *Indian Country, U.S.A.*, 829 F.2d at 978. Addi-

tionally, the government's construction of the Oklahoma Enabling Act ignores § 1 of that Act, 34 Stat. 267–78, which preserved federal authority. *Indian Country, U.S.A.*, 829 F.2d at 979.

■ The government's position is undermined further because Congress has granted some states criminal jurisdiction over Indian country. *See, e.g.*, 18 U.S.C. §§ 1162, 3243. *See also California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987); *Ross v. Neff*, 905 F.2d 1349, 1352 (10th Cir.1990). Equally relevant, the United States has consented to States assuming criminal jurisdiction in Indian country, provided that the Tribe consents. 25 U.S.C. §§ 1321, 1324. Oklahoma, however, has not taken the affirmative steps necessary for such an assumption of jurisdiction, let alone obtained consent. *Ross*, 905 F.2d at 1352; *Indian Country, U.S.A.*, 829 F.2d at 980; *State ex rel. May v. Seneca–Cayuga Tribe*, 711 P.2d 77, 88 (Okla.1985); *Burnett*, 671 P.2d at 1167–68. *See also Kennerly v. District Ct.*, 400 U.S. 423, 427, 91 S.Ct. 480, 482, 27 L.Ed.2d 507 (1971) (Montana without jurisdiction); *United States v. Baker*, 894 F.2d 1144, 1146 (10th Cir.1990) (Colorado without jurisdiction). The State of Oklahoma does not have jurisdiction over a criminal offense committed by one Creek Indian against another in Indian country. *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1446 (D.C.Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *Cravatt v. State*, 825 P.2d 277, 279 (Okla.Crim.App.1992); *State v. Klindt*, 782 P.2d 401, 402–403 (Okla.Crim.App.1989); *State v. Brooks*, 763 P.2d 707, 710 (Okla.Crim.App.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). The federal government does. *See Solem v. Bartlett*, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 1163 n. 2, 79 L.Ed.2d 443 (1984); *DeCoteau v. District County Ct.*, 420 U.S. 425, 427–28, 95 S.Ct. 1082, 1084–85, 43 L.Ed.2d 300 (1975). Although the government urges that previous cases supporting this conclusion have failed to examine the turn-of-the-century Congressional enactments it relies on, the government did not cite, let alone analyze,

*Indian Country U.S.A.* which did so in several material respects. We remain unpersuaded by the argument. The government reminds us that law enforcement might be easier if the State had jurisdiction over the checkerboard of Indian and non-Indian land involved. We are not empowered to decide the issue on that basis, but we note that cross-deputization may assist in filling a jurisdictional void.

## II.

Mr. Sands first contends that the prosecutor improperly commented on his post-arrest silence in violation of the Fifth Amendment. A defendant's silence at the time of arrest and after receiving a *Miranda* warning may not be used for impeachment. *Doyle v. Ohio*, 426 U.S. 610, 620, 96 S.Ct. 2240, 2246, 49 L.Ed.2d 91 (1976). The rationale for the rule is that a *Miranda* warning implies to a defendant that silence carries no penalty; silence as impeachment of a subsequently offered explanation at trial would contravene that implication. *Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct. 3102, 3107, 97 L.Ed.2d 618 (1987); *Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245.

After being reminded that he was not too drunk to remember several other details, Mr. Sands stated:

A: I know if you had asked me these questions the day after, I wouldn't have remembered. But, yes, I remember now.

Q: You recall now—there is no record of what you said the day after this incident, is there?

A: No.

Q: You didn't make any comment to anyone at that point in time about what had happened or make any effort to keep a record of what had happened, did you?

(Objection).

IV R. 343. The prosecutor claimed that the above exchange was offered not to impeach Mr. Sands' subsequent in-court explanation, but rather to follow up on Mr. Sands' statement that he could not have remembered the events in question the day after

the murder. On appeal, the government contends that the purpose of the questions was to impeach Mr. Sands' claim that he had no recollection, either post-arrest or at trial, of firing a second round of shots at the victim after the victim had collapsed behind the car. *See Id.* at 334.

We agree with Defendant's trial counsel that the two questions were improper because of their potential to mislead the jury by suggesting that Mr. Sands had some kind of duty to come forward post-arrest. *Id.* at 344. But when the questions are placed in the context of Mr. Sands' entire trial testimony, we feel that they are not of the type which call attention to his post-arrest silence as a means of impeaching his *subsequent* explanation. Mr. Sands consistently has maintained that he does not remember firing the second round of shots at the victim. The two questions at issue were brief, an objection to the second question was sustained promptly, and the matter did not surface again. *See Greer*, 483 U.S. at 764, 107 S.Ct. at 3108. Defendant did not request a curative instruction, perhaps for tactical reasons, and we cannot say that the district court was required to give one under the circumstances. *See United States v. Morales–Quinones*, 812 F.2d 604, 613 (10th Cir.1987). The district court did not abuse its discretion in denying defendant's motion for a mistrial on this point.

## III.

Mr. Sands next contends that a comment made by the prosecutor in closing argument warrants reversal. Because no objection was made below, our review is for plain error and reversal is appropriate only if, after reviewing the entire record, we conclude that the error is obvious and one that would undermine the fairness of the trial and result in a miscarriage of justice. Fed.R.Crim.P. 52(b); *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire

trial. *Young,* 470 U.S. at 11–12, 105 S.Ct. at 1044–45.

In arguing that Mr. Sands acted with premeditation, the prosecutor stated:

> Did the defendant premeditate? We submit to you the defendant premeditated when he ordered, pull over or I'll kill you. We suggest that the defendant premeditated, let's shoot the driver.

IV R. 357. The prosecutor continued specifying some two-dozen circumstances which he felt would support premeditation.

Mr. Sands contends that attributing the statement "Pull over or I'll kill you" to him resulted in prejudice because other evidence concerning premeditation "was far from overwhelming." Aplt. Brief at 20. When evaluating errors claimed by appellate counsel which were not raised by trial counsel, "we must be cautious of a 'tendency to seize upon errors which, removed from context, take on an aspect of seriousness which they never had below.'" *United States v. Mitcheltree,* 940 F.2d 1329, 1333 n. 5 (10th Cir.1991) (quoting 8B J. Moore, *Moore's Federal Practice* ¶ 52.03 (1991)). This is the paradigmatic case for application of that admonition.

The evidence *in this trial* concerning premeditation was strong. Mr. Sands pointed the gun at the victim, clicked it, and said "Now it's ready" and "Let's shoot the driver" before the murder. Additionally, there were two rounds of shots which allowed ample time for premeditation. The district court gave the stock instruction that the jury must rely on its own recollection of the evidence when it differed from that described by counsel. While the prosecutor may have overstated the evidence with the remark in question, we do not think it impaired "the jury's ability to judge the evidence fairly." *See Young,* 470 U.S.

at 12, 105 S.Ct. at 1044. The remark was not plain error.

## IV.

■■ Mr. Sands next contends that the district court erred in declining to instruct the jury that voluntary intoxication may negate premeditation. In evaluating jury instructions, we review them as a whole to determine whether they adequately set out the law and provide the jury with sufficient guidance to decide the case. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973). Without question, voluntary intoxication can negate the existence of the premeditation required for first degree murder. *Hopt v. Utah,* 104 U.S. 631, 634, 26 L.Ed. 873 (1881); *United States v. Slader,* 791 F.2d 655, 658 (8th Cir.), *cert. denied,* 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986). The issue is whether the jury was apprised sufficiently that voluntary intoxication could negate an element of first degree murder.

Mr. Sands concedes that the district court instructed that first degree murder requires proof of specific intent and that voluntary intoxication may prevent the existence of such intent.[3] His complaint is that the instructions failed to link specific intent with premeditation, for which voluntary intoxication is a defense. *See United States v. Shuckahosee,* 609 F.2d 1351, 1356 n. 11 (10th Cir.1979) (instruction integrating specific intent and premeditation was "above reproach"), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980). During deliberations, the jury sent out a note beginning with the phrase "voluntary intoxication" and then repeating part of the instruction on specific intent, followed by a question mark. The district court indicated that it did not consider the note a question,

---

**3.** The district court instructed in pertinent part:

> The crime charged in the indictment requires that the specific intent on the part of the defendant must be proved beyond a reasonable doubt before you may find the defendant guilty of the crime charged.
>
> Specific intent requires more than a general intent to engage in certain conduct. A person who knowingly does an act the law forbids or knowingly fails to do an act which the law

requires, purposely intending either to disobey or to disregard the law, may be found to act with specific intent.

> Intoxication or drunkenness alone will never provide a legal defense or excuse for the commission of a crime. However, the fact that a person may have been intoxicated at the time of the commission of a crime may prevent the existence of specific intent.

IV R. 379.

and urged the jury to write down a specific question and submit it. The jury did not respond until it returned a verdict.

The jury was instructed repeatedly that first degree murder required a specific intent to kill and adequately that intoxication could be sufficient to negate such an intent. Contrary to Mr. Sands' argument, the district court did reference specific intent when discussing premeditation.[4] A well-developed issue in closing argument concerned Mr. Sands' specific intent to kill his victim, considering the quantity of alcohol he drank. *See, e.g.,* IV R. 365 ("Ricky didn't have all his faculties about him. [I]t certainly doesn't equate to a premeditated first degree murder after he had so much to drink it clouds your ability to judge."); 361 ("The defendant, though drinking, was not too drunk to form the specific intent to do what he did."). The jury instructions accurately stated the law and addressed the intoxication defense presented by the Defendant. Although the jury may have had a question about the instructions, we must presume that the jury followed them and that any question was resolved when the jury declined to seek specific guidance from the court. *See Lakeside v. Oregon,* 435 U.S. 333, 340, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319 (1978).

## V.

Notwithstanding that his trial counsel secured a mistrial and a reversal on appeal, Mr. Sands now contends that his trial counsel was ineffective from the outset and that the district court erred in not granting him an evidentiary hearing to prove it. Mr. Sands chose to present this claim by way of a motion for new trial, Fed.R.Crim.P. 33, and trial counsel moved to withdraw because Mr. Sands sought his testimony in proving the ineffectiveness claim. The dis-

trict court denied both motions and declined to reconsider.

■■■■ To prevail on an ineffective assistance of counsel theory, Mr. Sands was required to show that his counsel's performance was deficient when judged against prevailing practice and that he was prejudiced to the extent that the result of the trial is unreliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A defendant must overcome the strong presumption that counsel's challenged action was strategic and our review is highly deferential. *Id.* at 689, 104 S.Ct. at 2065.

Mr. Sands presents a litany of complaints concerning trial counsel's representation, including alleged failures (1) to contact unnamed potential witnesses, (2) to introduce evidence concerning adverse cultural conditions such as poverty and alcoholism, (3) to introduce testimony concerning Mr. Sands' alcoholism, (4) to correct deficiencies in the evaluation of Mr. Sands by the Bureau of Prisons, and (5) to take an active interest in the case and vigorously defend him. Mr. Sands also contends that the following evidence was not developed or presented due to the fault of trial counsel: (1) that the victim had a propensity toward violence, (2) that the victim died before receiving the second round of gunshots, (3) that the United States was without jurisdiction, and (4) that Mr. Sands was of good character. He claims that the federal public defender is "too overburdened" to represent him adequately and seeks new counsel from the private sector. The district court viewed these grounds as frivolous and characterized defense counsel's representation as "just an excellent job.... You represented your client in every way." II R. 8.

■■■■ Mr. Sands recognizes this circuit's rule that ineffective assistance of

---

**4.** The instruction provided in pertinent part:
Premeditation means meditating, thinking, or considering a matter in advance of acting. The necessary duration of that period cannot be arbitrarily fixed. The time required to form an intent or design varies as the minds and temperaments of human beings differ, and according to the surrounding circumstances in which they may be placed. *Any*

*interval of time between the forming of the specific intent* to kill, and the execution of *that intent,* which is of sufficient duration for the defendant to be aware and mindful of what he intended willfully to set about to do, is sufficient to justify a finding of premeditation.

IV R. 377–78 (emphasis supplied).

counsel claims generally are not resolved on direct appeal, save in rare circumstances where the record before us allows for a fair evaluation of the merits of the claim. *Beaulieu v. United States,* 930 F.2d 805, 807 (10th Cir.1991). *See also United States v. Higdon,* 832 F.2d 312, 313–14 (5th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1051, 98 L.Ed.2d 1013 (1988). He correctly points out, however, that it is his right to seek a new trial as part of the original criminal proceedings (rather than by way of collateral attack) on the grounds of ineffective assistance of counsel. *See United States v. Taglia,* 922 F.2d 413, 417 (7th Cir.) *cert. denied,* — U.S. —, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991); *United States v. Aulet,* 618 F.2d 182, 186 n. 3 (2d Cir.1980). *See also United States v. Soto Hernandez,* 849 F.2d 1325, 1327 (10th Cir. 1988); *United States v. Golub,* 694 F.2d 207, 209 (10th Cir.1982); *United States v. Allen,* 554 F.2d 398, 404 (10th Cir.), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977). The difficulty with Mr. Sands' argument is that to obtain an evidentiary hearing, a defendant must identify specific facts and circumstances outside the record which, if proven, would entitle him to a new trial. *Cf. Moore v. United States,* 950 F.2d 656, 661 (10th Cir.1991).

■ A district court's decision denying an evidentiary hearing in connection with a new trial motion is reviewed for an abuse of discretion. *United States v. Thornbrugh,* 962 F.2d 1438, 1443 (10th Cir. 1992). The district court did not abuse its discretion in denying an evidentiary hearing for several reasons. First, Mr. Sands' motion for a new trial based on ineffective assistance is not responsive to either the performance or prejudice components of *Strickland.* Second, even recognizing that at this stage we would assume the factual allegations to be true, Mr. Sands fails to include even one supporting fact in his motion; rather, he asserts general grievances. For example, he complains that defense counsel failed to contact or question potential witnesses, but never provides the names or probable testimony of these witnesses. Nor does he explain how he was prejudiced by the lack of testimony. While we agree that a district court should conduct an inquiry when a colorable claim of ineffective assistance of counsel is raised at trial, *see United States v. McCord,* 509 F.2d 334, 352 n. 65 (D.C.Cir.1974) (en banc), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975), Mr. Sands' claim, as presented to the district court, is not colorable.

## VI.

■ Mr. Sands' final point on appeal is that the district court sentenced him under the mistaken impression that no downward departure under the Sentencing Guidelines was available for first degree murder under 18 U.S.C. § 1111. *See* 18 U.S.C. § 3553(b) (downward departure); U.S.S.G. § 5K2.0 (same). Under current federal law, § 1111 provides that a defendant convicted of first degree murder "shall ... be sentenced to imprisonment for life." Parole is unavailable under the Sentencing Guidelines. Thus, § 1111 provides a statutorily required minimum sentence which would control over any other lesser sentence suggested under the guidelines. *See* U.S.S.G. § 5G1.1; *United States v. Rodriguez,* 938 F.2d 319, 320 (1st Cir.1991).

Mr. Sands argues that § 1111 is a Class A felony with a sentence for "the duration of the defendant's life or any period of time." 18 U.S.C. § 3581(b)(1). *See also* 18 U.S.C. §§ 3559(a); U.S.S.G. § 2A1.1, comment. (n.1 & backg'd). However, we agree with those courts which have held that the sentencing scheme established by § 3581(b)(1) in conjunction with § 3559(a) does not supplant the statutory minimum sentence in § 1111. *See United States v. LaFleur,* 952 F.2d 1537, 1545–46 (9th Cir. 1991); *United States v. Gonzalez,* 922 F.2d 1044, 1048–51 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991); *United States v. Donley,* 878 F.2d 735, 739–41 (3rd Cir.1989)), *cert. denied,* 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990). Thus, the district court was required to impose a life sentence and could not consider a downward departure.

For the foregoing reasons, Mr. Sands' conviction and sentence are AFFIRMED.